Karl H. Smith, Esq.
Nevada Bar #6504
COULTER HARSH LAW
403 Hill St.,
 Reno NV 89501
P:      775.324.3380
F:      775.324.3381
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ANDRZEJ TOCZEK, derivatively on behalf of
PAYSIGN, INC.,

      Plaintiff,

      vs.

MARK R. NEWCOMER, MARK ATTINGER,
DANIEL H. SPENCE, JOAN M. HERMAN,
DAN R. HENRY, BRUCE A. MINA, DENNIS
TRIPLETT, and QUINN WILLIAMS,

      Defendants,

      and

PAYSIGN, INC.,

      Nominal Defendant.

Case No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Andrzej Toczek ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of

Nominal Defendant Paysign, Inc. ("Paysign" or the "Company"), files this Verified Shareholder

Derivative Complaint against Individual Defendants Mark R. Newcomer, Mark Attinger, Daniel H.

Spence, Joan M. Herman, Dan R. Henry, Bruce A. Mina, Dennis Triplett, and Quinn Williams

(collectively, the "Individual Defendants" and together with Paysign, the "Defendants") for breaches of

their fiduciary duties as directors and/or officers of Paysign, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Paysign, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Paysign's directors and officers from March 12, 2019 through the present (the "Relevant Period").

2. Paysign is a Nevada-based provider of prepaid debit card programs to large corporate clients and other business institutions, including Fortune 500 companies, universities, social media companies, and pharmaceutical manufacturers. The Company also provides card processing software and related services for various types of prepaid debit cards in the prepaid card market, such as gift cards, payroll cards, and government disbursement cards, through the Company's "PaySign" card processing software platform.

3. Paysign operates in the information technology ("IT") sector, and so in addition to maintaining internal controls over its financial reporting, the Company purports to maintain IT general controls. IT general controls are a company's controls over the systems, processes and data that make up the company's IT environment, including controls over computer operations, data backup and recovery

programs, and access to accounts, applications, and program files. The Company's IT general controls are therefore of particular importance as an indicator of the integrity of the Company's operations, as well as its overall business performance.

4.      During the Relevant Period, the Company's IT general controls contained certain material deficiencies related to access to user accounts as well as the Company's change management to financial applications. As such, and as the Individual Defendants would eventually disclose, the Company's IT general controls were not adequately implemented or maintained. These deficiencies also indicated that the Company lacked effective internal controls over its financial reporting.

5.      The Individual Defendants concealed the existence of these control failures from the investing public, instead affirmatively representing throughout the Relevant Period that the Company maintained effective disclosure controls and internal controls over its financial reporting.

6.      The truth emerged on March 16, 2020, when the Individual Defendants revealed that the Company had discovered material weaknesses in the Company's internal controls and IT general controls, and as a result, the Company would be forced to delay filing its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). As a company that has registered securities under the Securities Act of 1933, First Choice is subject to the reporting obligations of Section 15(d) of the Exchange Act, which include making annual reports on Form 10-K within the period specified in such reports. The Individual Defendants thus caused the Company to become delinquent in its filings with the SEC.

7.      On this news, the price of the Company's stock dropped by over 16%, falling from $5.52 per share at the close of trading on the prior trading day, March 13, 2020, to $4.59 per share at the close of trading on March 16, 2020.

8.      Subsequently, on March 30, 2020, the Individual Defendants revealed that as a further consequence of the material weaknesses in the Company's controls, the Company's year-end earnings call, which had been set for March 25, 2020, would need to be delayed until March 31, 2020. Yet, two

Verified Amended Shareholder Derivative Complaint

days later, the Individual Defendants again delayed the Company's year-end earnings call, which would ultimately not be held until April 6, 2020.

9.      On this news, the price of the Company's stock plunged by another 16%, falling from $5.16 per share at the close of trading on March 31, 2020, to $4.35 per share at the close of trading on April 1, 2020.

10.      On April 3, 2020, NASDAQ officials informed the Company that due to the Company's failure to timely file the 2019 10-K, the Company was no longer in compliance with the listing rules for companies traded on NASDAQ.

11.      The Company ultimately filed its 2019 10-K that same day, on April 3, 2020, which stated, among other things, that Company management had determined that the Company's internal controls were not effective as of December 31, 2019, and revealed an additional material weakness in the Company's disclosure controls.

12.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material

fact to the investing public, while four of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of over $5.7 million.

14.     The Individual Defendants also breached their fiduciary duties by failing to maintain an adequate system of oversight, disclosure controls and procedures, internal controls, and IT general controls, and by causing the Company to fail to timely file the 2019 10-K with the SEC.

15.     In light of the Individual Defendants' misconduct, which has subjected Paysign, its President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in three federal securities fraud class action lawsuits pending in the United States District Court for the District of Nevada (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the CEO's and Company's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule

14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.    Venue is proper in this District because Paysign is incorporated in and headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

### **Plaintiff**

23.    Plaintiff is a current shareholder of Paysign. Plaintiff has continuously held Paysign common stock at all relevant times. Plaintiff is a citizen of California.

### **Nominal Defendant Paysign**

Verified Amended Shareholder Derivative Complaint

24.     Paysign is a Nevada corporation with its principal executive offices at 1700 W Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89012. Paysign's shares trade on the NASDAQ under the ticker symbol "PAYS."

**Defendant Newcomer**

25.     Defendant Mark R. Newcomer ("Newcomer") is a cofounder of the Company, and has served as the Company's President and CEO since March 2006. He also serves as the Vice Chairman of the Board. According to the Company's annual report on Form 10-K/A filed with the SEC on April 29, 2020 (the "2019 10-K/A"), as of April 15, 2020, Defendant Newcomer beneficially owned 9,034,146 shares of the Company's common stock, which represented 18.4% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Newcomer owned over $59 million worth of Paysign stock.

26.     For the fiscal year ended December 31, 2019, Defendant Newcomer received $1,031,969 in compensation from the Company. This included $883,333 in salary, a $53,600 bonus, $63,036 in stock awards, and $32,000 in all other compensation.

27.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Newcomer made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 4/18/2019 | 35,000 | $8.43 | $295,050 |
| 9/16/2019 | 200,000 | $11.03 | $2,206,000 |

28.     Thus, in total, before the fraud was exposed, he sold 235,000 Company shares on inside information, for which he received over $2.5 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.     The Company's 2019 10-K/A stated the following about Defendant Newcomer:

Mr. Newcomer serves as our President and Chief Executive Officer and has served in this capacity and as a director since March 2006. From February of 2001 to present, Mr. Newcomer continues to serve as chairman and CEO of 3PEA Technologies, Inc., a payment solutions company he co-founded in 2001 with Mr. Spence. Mr. Newcomer continues to be a driving force in guiding the company's growth through technology investments, acquisitions, new product lines, and strategic partnerships. Mr. Newcomer attended Cal-Poly San Luis Obispo where he majored in Bio-Science. We believe Mr. Newcomer should serve as our chairman based on the perspective and experience he brings to our board of directors as our founder and Chief Executive Officer, which adds historical knowledge, operational expertise and continuity to our board of directors.

30.     Upon information and belief, Defendant Newcomer is a resident of Nevada.

**Defendant Attinger**

31.     Defendant Mark Attinger ("Attinger") has served as the Company's CFO and Treasurer since December 2018. According to the 2019 10-K/A, as of April 15, 2020, Defendant Attinger beneficially owned 52,843 shares of the Company's common stock, which represented 0.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Attinger owned approximately $345,593 worth of Paysign stock.

32.     For the fiscal year ended December 31, 2019, Defendant Attinger received $647,088 in compensation from the Company. This included $323,731 in salary, $312,157 in stock awards, and $11,200 in all other compensation.

33.     The Company's 2019 10-K/A stated the following about Defendant Attinger:

Mr. Attinger serves as our Chief Financial Officer and Treasurer, since December 2018. Prior to joining Paysign, Inc. Mr. Attinger served as President and Chief Operating Officer for Genesis Financial, Inc. from April 2018 to October 2018; Chief Executive Officer for Zxerex Corporation from November 2016 to March 2018; founding Partner and Principal of management consulting firm Customer Servicing Solutions, LLC from 2007 to 2016. He held positions as Chief Executive Officer of Affina (a business process outsourcer) (2003 to 2007); Chief Operating Officer at Prudential Financial (2002 to 2003) and Vice President of Operations at NextCard (2000 to 2002). Mr. Attinger also served at American Express from 1987 to 2000 in various positions in Finance, Performance and Quality Management, and Operations. Mr. Attinger earned a Bachelor of Science degree in

Finance, with a minor in Accounting, and a Master of Business Administration degree, both from Brigham Young University.

34.     Upon information and belief, Defendant Attinger is a resident of Nevada.

**Defendant Spence**

35.     Defendant Daniel H. Spence ("Spence") is a cofounder of the Company, and has served as the Company's Chief Technology Officer ("CTO") and as a Company director since March 2006. According to the 2019 10-K/A, as of April 15, 2020, Defendant Spence beneficially owned 8,790,000 shares of the Company's common stock, which represented 17.9% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Spence owned over $57.4 million worth of Paysign stock.

36.     For the fiscal year ended December 31, 2019, Defendant Spence received $663,036 in compensation from the Company. This included $600,000 in salary and $63,036 in stock awards.

37.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Spence made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 9/23/2019 | 20,681 | $11.01 | $227,697 |
| 9/24/2019 | 3,100 | $11.02 | $34,162 |
| 10/2/2019 | 1,600 | $11.00 | $17,600 |
| 10/3/2019 | 49,981 | $11.02 | $550,790 |
| 10/4/2019 | 44,638 | $11.40 | $508,873 |

38.     Thus, in total, before the fraud was exposed, he sold 120,000 Company shares on inside information, for which he received over $1.33 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.     The Company's 2019 10-K/A stated the following about Defendant Spence:

Mr. Spence serves as our Chief Information Officer and has served as a director since March 2006. Mr. Spence is responsible for the design and architecture of the Paysign® payments platform. Prior to founding 3PEA Technologies, Inc. with co-founder Mr. Newcomer, Mr. Spence designed and developed secure middleware for Internet financial processing systems in various contract positions. Mr. Spence was Systems Manager from 1995 to 1997, and then Director of Technology Planning from 1997 to 1999 at The Associated Press, the world's largest news gathering organization with over 4000 employees in 227 countries. From 1984-1994, Mr. Spence was with Coca-Cola in Australia implementing financial and line of business systems for Coca-Cola operations worldwide. In 2007-2008, he was Project Manager for the implementation of Medicare Easyclaim for ANZ Bank in Australia. Easyclaim allows patients and medical practitioners to lodge Medicare claims using the existing EFTPOS infrastructure. In 2010-2011 he was Business Analyst on the EFT and Banking Stream that was responsible for the upgrade of POS Terminals to EMV capability for Australia Post. Previously for 3PEA, he designed and developed EFTPOS terminals and secure key injection systems, and the software tools (API/SDK) for the EFTPOS terminal integration by third party developers. He has certified several financial interchanges in the ISO8583 and AS2805 standards to various EFT networks in the United States and Australia. He has over 25 years' experience deploying large-scale technology solutions for major international corporations. We believe that Mr. Spence should serve as a director based on his experience in internet financial processing systems and as a founder of our company.

40.     Upon information and belief, Defendant Spence is a resident of Australia.

**Defendant Herman**

41.     Defendant Joan M. Herman ("Herman") has served as the Company's Chief Operating Officer ("COO") and as a Company director since November 2018. According to the 2019 10-K/A, as of April 15, 2020, Defendant Herman beneficially owned 519,808 shares of the Company's common stock, which represented 1.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Herman owned over $3.39 million worth of Paysign stock.

42.     For the fiscal year ended December 31, 2018, Defendant Herman received $407,700 in compensation from the Company. This included $250,000 in salary, $147,700 in stock grants, and $10,000 in all other compensation.

43.     The Company's 2019 10-K/A stated the following about Defendant Herman:

Ms. Herman serves as our Chief Operating Officer since September 2017and director since November 2018. Ms. Herman's experience in payments spans more than 30 years, holding

various management positions in operations, product development, and sales and marketing on both the issuing and acquiring sides of the card business. Ms. Herman's previous employers and directorships include Sunrise Bank from June 2012 to August 2017, UMB Bank from 2010 to 2012 and Heartland Bank from 2006 to 2010, and served as a Director at Heartland Payment Systems from 1997 to 2006. Ms. Herman is a member of the Board of Directors of the National Branded Prepaid Card Association (NBPCA) and serves as its Treasurer. Ms. Herman earned her B.A. and M.A. in business and marketing from Webster University, St. Louis, Missouri.

44.     Upon information and belief, Defendant Herman is a resident of Nevada.

**Defendant Henry**

45.     Defendant Dan R. Henry ("Henry") has served as the Company's Chairman of the Board since May 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2019 10-K/A, as of April 15, 2020, Defendant Henry beneficially owned 600,000 shares of the Company's common stock, which represented 1.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Henry owned over $3.92 million worth of Paysign stock.

46.     For the fiscal year ended December 31, 2019, Defendant Henry received $413,568 in compensation from the Company. This included $21,000 in fees earned or paid in cash and $392,568 in option awards.

47.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Henry made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 9/18/2019 | 2,572 | $11.21 | $28,832 |
| 9/23/2019 | 14,308 | $11.01 | $157,531 |
| 9/24/2019 | 1,100 | $11.03 | $12,133 |
| 10/2/2019 | 1,800 | $11.00 | $19,800 |
| 10/3/2019 | 31,674 | $11.02 | $349,047 |
| 10/4/2019 | 98,546 | $11.53 | $1,136,235 |

48.     Thus, in total, before the fraud was exposed, he sold 150,000 Company shares on inside information, for which he received over $1.7 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2019 10-K/A stated the following about Defendant Henry:

Mr. Henry has served as a director since May 2018. Mr. Henry has been a private investor and advisor since 2013. Mr. Henry previously served as Chief Executive Officer of NetSpend, a leading provider of prepaid debit cards for personal & commercial use, from 2008 to 2014. Prior to that, he served as president and chief operating officer of Euronet, a global leader in processing secure electronic financial transactions from 1994 to 2006. He was also a co-founder of Euronet and served on its board until January 2008. Mr. Henry currently serves as Chief Executive Officer of Green Dot Corporation and serves on the Boards of Directors of Paysign and Dama Financial. Mr. Henry is a seasoned financial services industry entrepreneur who brings valuable senior leadership, experience and insight to the Board.

50.     Upon information and belief, Defendant Henry is a resident of Texas.

**Defendant Mina**

51.     Defendant Bruce A. Mina ("Mina") has served as a Company director since March 2018. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2019 10-K/A, as of April 15, 2020, Defendant Mina beneficially owned 105,500 shares of the Company's common stock, which represented 0.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Mina owned approximately $689,970 worth of Paysign stock.

52.     For the fiscal year ended December 31, 2019, Defendant Mina received $79,456 in compensation from the Company. This included $21,000 in fees earned or paid in cash and $58,456 in restricted stock awards.

53.     The Company's 2019 10-K/A stated the following about Defendant Mina:

12

Mr. Mina has served as a director since March 2018. Mr. Mina, MS-Taxation, CPA/ABV, CFF, CVA, BVAL is a co- founder & managing member of Mina Llano Higgins Group, LLP (founded 1974). Mr. Mina is a Certified Public Accountant licensed in the State of New York for over 30 years. He is experienced in, and responsible for litigation support and valuation assignments regarding business valuations, damage studies and appraisal engagements. Mr. Mina has been retained as a Business Appraiser, Expert Witness, Consultant, Forensic Examiner, Auditor, Accountant and Tax Planner by business owners and corporate officers, attorneys and Municipalities to provide services in business appraisal and enterprise valuation, forensic examination and litigation support. Mr. Mina served as CFO for Coal Brick Oven Pizzeria, Inc., a Nevada corporation that operates the Grimaldi's Pizzeria chain of restaurants, from 2011 to 2018. He also has served as CFO for Academy of Aviation in Long Island, NY since 2009. Mr. Mina earned his B.A. degree from Hofstra University, and his Master of Science-Taxation Degree from Long Island University.

54.     Upon information and belief, Defendant Mina is a resident of New York.

**Defendant Triplett**

55.     Defendant Dennis Triplett ("Triplett") has served as a Company director since May 2018. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2019 10-K/A, as of April 15, 2020, Defendant Triplett beneficially owned 100,000 shares of the Company's common stock, which represented 0.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Triplett owned approximately $654,000 worth of Paysign stock.

56.     For the fiscal year ended December 31, 2019, Defendant Triplett received $87,817 in compensation from the Company. This included $21,000 in fees earned or paid in cash and $66,817 in restricted stock awards.

57.     The Company's 2019 10-K/A stated the following about Defendant Triplett:

Mr. Triplett has served as a director since May 2018. Mr. Triplett served as CEO (March 2004 to April 2015) and Chairman (April 2015 to March 2017) of Healthcare Services at UMB Bank, N.A. a leading provider of healthcare payment solutions including health savings accounts (HSAs), healthcare spending accounts and payments technology. Mr. Triplett founded this division that is now the fifth largest HSA custodian in the nation with $2.6 billion in assets and accounts exceeding 1.25 million.  Mr. Triplett developed the Bank's Medical Savings Account product in the late 90's and grew that into a multipurpose card product supporting a variety of spending accounts including HSAs, FSAs, and HRAs. Mr. Triplett has over 35 years of experience in the banking industry including serving as

the President and CEO of two banks in the Midwest and has extensive credit and debit card experience. Mr. Triplett is a graduate of several banking schools and holds an MBA degree from the University of Missouri. Mr. Triplett industry leadership has included Chairing the Employers Council on Flexible Compensation (ECFC) from 2007 to 2014; a founding Board Member of the American Bankers Association's HSA Council; Chairing American Health Insurance Plan's (AHIP) HSA Leadership Council from 2009 to 2013. Civically, Mr. Triplett serves on the Board of the Greater Kansas City Crime Commission since 2011, Chairperson for Community for Coaches since 2016 and member of UMB Healthcare Services Strategic Advisory Council since 2016.

58.     Upon information and belief, Defendant Triplett is a resident of Missouri.

**Defendant Williams**

59.     Defendant Quinn Williams ("Williams") has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2019 10-K/A, as of April 15, 2020, Defendant Williams beneficially owned 85,000 shares of the Company's common stock, which represented 0.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $6.54, Defendant Williams owned approximately $555,900 worth of Paysign stock.

60.     For the fiscal year ended December 31, 2019, Defendant Williams received $100,891 in compensation from the Company. This included $21,000 in fees earned or paid in cash and $79,891 in restricted stock awards.

61.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Williams made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 10/28/2019 | 15,000 | $10.94 | $164,100 |

Verified Amended Shareholder Derivative Complaint

62.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

63.     The Company's 2019 10-K/A stated the following about Defendant Williams:

Mr. Williams has served as a director since April 2018. Mr. Williams is an attorney and shareholder with the firm of Greenberg Traurig LLP, which he joined in June 2002. Admitted to the Bar in New York and Arizona, Mr. Williams practice focuses on mergers and acquisitions, public and private securities offerings, venture capital transactions and advising on the formation and funding of emerging companies. Mr. Williams' industry experience includes technology, fintech, banking, manufacturing, distribution, real estate and specialty service industries. He serves as corporate counsel for private companies and was formerly general counsel of an international retail franchisor and served on the Board of Directors of Swenson's Inc., in 1985. Mr. Williams possesses a long list of accolades and awards, including listed, *The Best Lawyers in America*, Corporate Law; Franchise Law; Venture Capital Law, 1995-2018; selected by *The Business Journal* "Best of the Bar Award" Corporate Financing, 2005, and is rated AV preeminent® 5.0 out of 5 from Martindale Hubbell. Mr. Williams graduated from the University of Wisconsin and University of Arizona College of Law.

64.     Upon information and belief, Defendant Williams is a resident of Arizona.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

65.     By reason of their positions as officers, directors, and/or fiduciaries of Paysign and because of their ability to control the business and corporate affairs of Paysign, the Individual Defendants owed Paysign and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Paysign in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Paysign and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to Paysign and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officer of Paysign, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of Paysign were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Paysign, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Paysign's Board at all relevant times.

70.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all

Verified Amended Shareholder Derivative Complaint

those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the officers and directors of Paysign were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Paysign were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Nevada, and the United States, and pursuant to Paysign's own Code of Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Paysign conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Paysign and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Paysign's operations would comply with all applicable laws and Paysign's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to Paysign and the shareholders the duty of loyalty requiring that each favor Paysign's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Paysign and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial positions with Paysign, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Paysign.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to

conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Paysign was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Paysign, and was at all times acting within the course and scope of such agency.

## PAYSIGN'S CODE OF ETHICS

81.     Paysign's Code of Ethics states that it "applies equally to all employees and other representatives of Paysign," and that "[t]he term employees have been used in the broadest sense and includes: all staff with whom a service contract exists, management, non-management, directors, contractors, consultants and temporary staff."

82.     In a section titled, "Compliance with Laws and Regulations," the Code of Ethics states the following, in relevant part:

> Employees must comply with all applicable laws and regulations which relate to their activities for and on behalf of Paysign. Paysign will not tolerate any violation of the law or unethical business dealing by any employee, including any payment for, or other participation in, an illegal act, such as bribery.

> Paysign is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for Paysign. Numerous federal, state and local laws and regulations define and establish obligations with which Paysign, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this code.

83.     In a section titled, "Insider Information and Insider Trading," the Code of Ethics states the following:

> Employees may receive information concerning Paysign or one of its affiliates, business partners, clients, or customers that is confidential and not generally known by the public. If that information is "material" (i.e., publication of that information is likely to affect the market price of the stock of the entity to which the information relates), then the employee has an ethical and legal obligation not to (a) act on that information (i.e., buy or sell stock based on that information), (b) disclose that information to others, or (c) advise others to buy or sell the stock of the entity to which that information relates, until such information becomes public. An employee's direct or indirect use of or sharing of such confidential, privileged, or otherwise proprietary business information of Paysign or its partners, clients, or customers for financial gain, including investment by the employee or the transmission of this information to others so that they can use this information for their financial gain, constitutes insider trading, which is a criminal offense. Please refer to Paysign's Insider Trading Policy for more information.

84.     In a section titled, "Paysign's Funds and Property," the Code of Ethics states the following:

> Paysign has developed a number of internal controls to safeguard its assets and imposes strict standards to prevent fraud and dishonesty. It is every employee's responsibility to

implement, maintain and enhance the effectiveness of the control environment in which they operate. All employees who have access to Paysign's funds in any form must at all times follow prescribed procedures for recording, handling and protecting such funds. Operating areas may implement policies and procedures relating to the safeguarding of Paysign property, including computer software.

Employees must at all times ensure that Paysign's funds and property are used only for legitimate Paysign business purposes. Where an employee requires Paysign funds to be spent, it is the employee's responsibility to use good judgment on Paysign's behalf and to ensure that appropriate value and authorization is received for such expenditure.

All payments made by or on behalf of Paysign for any purpose must be fully and accurately described in the documents and records supporting the payment. No false, improper, or misleading entries shall be made in the books and records of Paysign.

Complete and accurate information is to be given in response to inquiries from Paysign's Audit Committee and certified public accountants.

If employees become aware of any evidence that Paysign funds or property may have been or are likely to be used in a fraudulent or improper manner they should immediately and confidentially advise Paysign as set out in the contravention of the code section of this document. It is Paysign's policy that no retaliation or other adverse action will be taken against any employee for good- faith reports.

85.    In a section titled, "Paysign's Records," the Code of Ethics states the following:

Accurate and reliable records of many kinds are necessary to meet Paysign's legal and financial obligations and to manage the affairs of Paysign.

Paysign's books and records should reflect all business transactions in an accurate and timely manner. Undisclosed or unrecorded revenues, expenses, assets or liabilities are not permissible, and the employees responsible for accounting and record-keeping functions are expected to be diligent in enforcing proper practices.

86.    In a section titled, "Prompt Communications," the Code of Ethics states the following:

Paysign strives to achieve complete, accurate, fair, understandable and timely communications with all parties with whom it conducts business, as well as government authorities and the public. All employees must take all steps necessary to assist Paysign in fulfilling its disclosure responsibilities. In addition, prompt and effective internal communication is encouraged.

A prompt, courteous and accurate response should be made to all reasonable requests for information and other client communications. Any complaints should be dealt with in accordance with internal procedures established by various operating areas of Paysign and applicable laws.

87.     In a section titled, "Media Relations," the Code of Ethics provides that "[a]n employee, when dealing with anyone outside Paysign, including public officials, must take care not to compromise the integrity or damage the reputation of any outside individual, business, or government body, or that of Paysign."

88.     In a section titled, "Obligations of Employees, the Code of Ethics states the following:

It is of paramount importance to Paysign that all disclosure in reports and documents that Paysign files with, or submits to, the SEC, and in other public communications made by Paysign is full, fair, accurate, timely and understandable. You must take all steps available to assist Paysign in fulfilling these responsibilities consistent with your role within the Paysign. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Paysign's preparation of its public reports and disclosure.

All employees must perform their duties diligently, effectively and efficiently, and in particular:

a)      support and assist Paysign to fulfill its commercial and ethical obligations and objectives as set out in this Code;

b)      avoid any waste of resources, including time;

c)      be committed to improve productivity, achieve the maximum quality standards, reduce ineffectiveness, and avoid unreasonable disruption of activities at work;

d)      commit to honoring their agreed terms and conditions of employment;

e)      not act in any way that may jeopardize the shareholders rights to a reasonable return on investment;

f)      act honestly and in good faith at all times and report any harmful activity they observe in the workplace;

g)      recognize fellow employees' rights to freedom of association and not intimidate fellow employees;

h)      pay due regard to environmental, public health and safety conditions in and around the workplace; and

i)      act within their powers and not carry on the business of Paysign recklessly.

89.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants

failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

90.     Founded in 2001 under the name "3PEA Technologies, Inc.," Paysign is a provider of prepaid debit card programs and related card processing software and services. In March 2006, the Company completed a reverse-merger with Tika Corporation, a non-operating public company, through which the former 3PEA Technologies, Inc. became a subsidiary of Tika Corporation, and the Company rebranded itself as "Paypad, Inc." The Company again changed its name to "3PEA International, Inc." in October 2006, and once more on April 23, 2019 to Paysign, Inc.

91.     Today, the Company markets prepaid debit card programs under its PaySign brand, and issues debit cards in connection with its card programs to various corporate clients in the U.S. and abroad. Additionally, the Company offers a card processing software platform also branded "PaySign" that provides transaction processing, cardholder enrollment, cardholder account management, value loading, and other related services to prepaid card issuers, small and mid-size financial institutions, and other customers.

92.     As a company that operates in the IT business, and has a significant component of its business model centered on processing and storing data, Paysign maintains IT general controls over the systems, processes, programs, and data files that make up its IT environment. Such controls include, among other things, controls over access to user accounts, applications, data, and program files, controls over program change management, security controls over the Company's data centers and computer network systems, data backup and recovery controls and procedures, and controls over the general operation of the Company's computer systems and software.

93.     Throughout the Relevant Period, the Individual Defendants caused the Company to file annual and periodic reports with the SEC that asserted that the Company had effective disclosure controls and internal controls over financial reporting, and that there were no changes in the effectiveness of the Company's controls from quarter to quarter.

94.     However, as the Individual Defendants would later admit, the Company in fact failed to maintain effective IT general controls or internal controls during the Relevant Period. These control failures would ultimately require the Company to delay the filing of its 2019 10-K, and to twice delay the Company's 2019 year-end earnings releases.

**False and Misleading Statements**

***March 12, 2019 Form 10-K***

95.     On March 12, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Newcomer, Attinger, Spence, Herman, Henry, Mina, Triplett, and Williams, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

96.     In its discussion of the various risks facing the Company, the 2018 10-K detailed the following risk factors related to the operation of the Company's computer systems and data centers, which failed to include any mention of the Company's deficient IT general controls:

> Our ability to provide reliable service to our clients and cardholders depends on the efficient and uninterrupted operation of our computer network systems and data centers as well as those of our third party service providers. Our business involves movement of large sums of money, processing of large numbers of transactions and management of the data necessary to do both. Our success depends upon the efficient and error-free handling of the money. We rely on the ability of our employees, systems and processes and those of the

banks that issue our cards, our third party service providers to process and facilitate these transactions in an efficient, uninterrupted and error-free manner.

In the event of a breakdown, a catastrophic event (such as fire, natural disaster, power loss, telecommunications failure or physical break-in), a security breach or malicious attack, an improper operation or any other event impacting our systems or processes, or those of our vendors, or an improper action by our employees, agents or third-party vendors, we could suffer financial loss, loss of customers, regulatory sanctions and damage to our reputation. The measures we have taken, including the implementation of disaster recovery plans and redundant computer systems, may not be successful, and we may experience other problems unrelated to system failures. We may also experience software defects, development delays and installation difficulties, any of which could harm our business and reputation and expose us to potential liability and increased operating expenses. We currently do not carry business interruption insurance.

97.    With respect to the Company's internal controls, the 2018 10-K stated the following, in relevant part:

Mark Newcomer, our chief executive officer, and Mark Attinger, our chief financial officer, are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2018. *Based on that evaluation, our chief executive officer and chief financial officer concluded that, as of the evaluation date, such controls and procedures were effective.*

* * *

There were no changes in our internal controls over financial reporting that occurred during the year ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

* * *

As of December 31, 2018 we conducted an evaluation, under the supervision and with the participation of our chief executive officer (our principal executive officer), our chief operating officer and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control - Integrated Framework issued by the Committee of

Sponsoring Organizations of the Treadway Commission, or the COSO Framework. Management's assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls.

A material weakness is defined within the Public Company Accounting Oversight Board's Auditing Standard No. 5 as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***Based upon this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018.***

(Emphasis added.)

### *April 12, 2019 Proxy Statement*

98.     On April 12, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Newcomer, Spence, Herman, Henry, Mina, Triplett, and Williams solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

99.     With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated, "[w]e have adopted a Code of Ethics that applies to all our directors, officers and employees."

100.    The 2019 Proxy Statement also called for shareholder approval of, among other things, the 3Pea International, Inc. 2018 Incentive Compensation Plan (the "2018 Incentive Compensation Plan"), which would authorize the Company to reserve a total of 5 million shares of Company stock to be issued to the Company's officers and directors in connection with performance-based awards.

101.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics were not followed, as evidenced by the numerous false and misleading

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

102.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

103.    As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders approved the 2018 Incentive Compensation Plan.

***May 8, 2019 Form 10-Q***

104.    On May 8, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Newcomer and Attinger, and contained SOX certifications signed by Defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

105.    With respect to the Company's internal controls, the 1Q19 10-Q stated the following, in relevant part:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial

27

officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2019. *Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.*

\* \* \*

*There were no changes in our internal controls over financial reporting that occurred during the quarter ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

(Emphasis added.)

***August 7, 2019 Form 10-Q***

106.    On August 7, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Newcomer and Attinger, and contained SOX certifications signed by Defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

107.    With respect to the Company's internal controls, the 2Q19 10-Q stated the following, in relevant part:

Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2019. *Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.*

\* \* \*

***There were no changes in our internal controls over financial reporting that occurred during the quarter ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

***November 6, 2019 Form 10-Q***

108.     On November 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Newcomer and Attinger, and contained SOX certifications signed by Defendants Newcomer and Attinger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.     With respect to the Company's internal controls, the 3Q19 10-Q stated the following, in relevant part:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of September 30, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***
>
> \* \* \*
>
> ***There were no changes in our internal controls over financial reporting that occurred during the quarter ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

Verified Amended Shareholder Derivative Complaint

(Emphasis added.)

110.    The 3Q19 10-Q also stated that "[t]here have been no material changes with respect to the risk factors disclosed in Part I. Item 1A of [the 2018 10-K]."

111.    The statements referenced in in ¶¶ 95–97 and 104–110 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

112.    Before the market opened on March 16, 2020, the Company issued a press release revealing that Company management had discovered material weaknesses related to the Company's internal controls and the Company's IT general controls. As a result, and in order to provide the Company with enough time to complete its financial audit, the Company would be forced to delay the filing of the 2019 10-K. The press release stated the following, in relevant part:

> [Paysign], a vertically integrated provider of innovative prepaid card programs, digital banking and processing services for corporate, consumer and government applications, *announced today that it will be delayed in the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2019. Paysign is filing a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission, which will provide Paysign with a 15 calendar-day extension beyond the March 16, 2020 deadline within which to file the annual report on Form 10-K. The filing extension will provide the necessary time to complete the financial audit.*
>
> For the full year 2019, total revenues are expected to be $34.7 million, an increase of 48% when compared to 2018. Net income attributable to Paysign on a GAAP basis is expected

to be $7.5 million, an increase of 188% when compared to 2018, and Adjusted EBITDA is expected to be $10.1 Million, an increase of 106% when compared to 2018.

These are preliminary results and estimates based on current expectations and are subject to completion of the financial audit. Actual results may differ materially. Paysign expects to finalize its financial results and file its Annual Report on Form 10-K no later than the prescribed due date allowed pursuant to Rule 12b-25.

***Separately, in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with Sarbanes-Oxley 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls.***

(Emphasis added.)

113.     On this news, the price of the Company's stock dropped from $5.52 per share at the close of trading on March 13, 2020, the prior trading day, to $4.59 per share at the close of trading on March 16, 2020, representing a loss in value of roughly 16.8%.

114.     On March 30, 2020, the Company announced to the public that the Company was forced to delay its year-end earnings call, previously scheduled for March 25, 2020, to March 31, 2020. Then, on April 1, 2020, the Company disclosed that it would again have to postpone its year-end earnings call to allow for "additional time to complete its year-end closing procedures."

115.     On this news, the price of the Company's stock dropped from $5.16 per share at the close of trading on March 31, 2020, to $4.35 per share at the close of trading on April 1, 2020, representing a loss in value of roughly 16%.

116.     On April 3, 2020, the Company issued a press release revealing that NASDAQ authorities had sent a notice to the Company indicating that due to the Company's failure to timely file the 2019 10-K, the Company was no longer in compliance with NASDAQ Listing Rule 5250(c)(1), which mandates the timely filing of periodic reports with the SEC.

117.     The Company's 2019 10-K was ultimately filed on April 3, 2020. The 2019 10-K stated that the Company had determined that its internal controls were not effective as of December 31, 2019, and further indicated that in addition to the material weaknesses previously disclosed on March 16, 2020,

the Company's auditors had noted a third material weakness in the Company's disclosure controls related to the Company's past employment of a part-time employee. The 2019 10-K stated the following, in relevant part:

> We have identified control deficiencies that constitute material weaknesses relating to: (i) management assessment of internal control over financial reporting and (ii) design, implementation and monitoring of information technology general controls. ***Additionally, a third material weakness cited by the auditors was that the Company lacked sufficient monitoring and disclosure controls when employing a part-time employee.***
>
> * * *
>
> ***As a result of these material weaknesses, our management concluded that our internal control over financial reporting were not effective as of December 31, 2019.*** Material weaknesses not remediated may adversely affect our ability to report our financial condition and results of operations in a timely and accurate manner, decrease investor confidence in our Company, and reduce the value of our common stock.
>
> * * *
>
> ***Material weaknesses included the management assessment of internal control over financial reporting, and ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management.*** During quarter 4 of 2019 and continuing in 2020, management has taken steps to i) improve the design and methods for testing internal controls, ii) added resources to carry out such practices, and iii) instituted new procedures for managing system user access and change control. Additionally, a third material weakness cited by the auditors was that the Company lacked sufficient monitoring and disclosure controls when employing a part-time employee.

(Emphasis added.)

## DAMAGES TO PAYSIGN

118.    As a direct and proximate result of the Individual Defendants' conduct, Paysign has lost and will continue to lose and expend many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO and President, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

32

121.    Additionally, these expenditures include costs associated with remediating the deficiencies in the Company's disclosure controls, internal controls, and IT general controls described herein.

122.    As a direct and proximate result of the Individual Defendants' conduct, Paysign has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

123.    Plaintiff brings this action derivatively and for the benefit of Paysign to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Paysign, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

124.    Paysign is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiff is, and has been at all relevant times, a shareholder of Paysign. Plaintiff will adequately and fairly represent the interests of Paysign in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

127.    A pre-suit demand on the Board of Paysign is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Newcomer, Spence, Herman, Henry, Mina, Triplett, and Williams (the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

Verified Amended Shareholder Derivative Complaint

128.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, four of the Directors sold Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130.     Additional reasons that demand on Defendant Newcomer is futile follow. Defendant Newcomer is a cofounder of the Company, and has served as the Company's President and CEO since March 2006. He also serves as the Vice Chairman of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Newcomer with his principal occupation, and he receives handsome compensation, including $1,031,969 in 2019 for his services. Defendant Newcomer was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings referenced herein, which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $2.5 million in proceeds, demonstrate his motive in facilitating and participating

in the fraud. Moreover, Defendant Newcomer is a defendant in the Securities Class Actions. For these reasons, Defendant Newcomer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on Defendant Spence is futile follow. Defendant Spence is a cofounder of the Company, and has served as the Company's CTO and as a Company director since March 2006. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Spence with handsome compensation, including $663,036 in 2019 for his services. As a trusted Company officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $1.33 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Spence signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Spence breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132. Additional reasons that demand on Defendant Herman is futile follow. Defendant Herman has served as the Company's COO and as a Company director since November 2018. Thus, as the Company admits, she is a non-independent director. Defendant Herman has received and continues to receive compensation for her roles with the Company as described above. As a trusted Company officer and director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Herman signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Herman breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

133.   Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry has served as the Company's Chairman of the Board since May 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Henry has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $1.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Henry signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Henry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Additional reasons that demand on Defendant Mina is futile follow. Defendant Mina has served as a Company director since March 2018. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Mina has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mina signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Mina breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.     Additional reasons that demand on Defendant Triplett is futile follow. Defendant Triplett has served as a Company director since May 2018. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Triplett has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Triplett signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Triplett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.     Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Williams has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded approximately $164,100 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Williams signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.     Additional reasons that demand on the Board is futile follow.

Verified Amended Shareholder Derivative Complaint

138.     As described above, four of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Newcomer, Spence, Henry, and Williams collectively received proceeds of over $5.7 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

139.     Defendants Henry, Mina, and Triplett (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

140.     Furthermore, the Directors face a substantial likelihood of liability for causing the Company to fail to timely file with the SEC the Company's 2019 10-K.

141.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Newcomer and Spence have worked together for nearly 20 years since co-founding Paysign's predecessor, 3PEA Technologies, Inc. in 2001. Additionally, between 2010 and 2012, Defendants Herman and Triplett served as Vice President and as CEO, respectively, at UMB Bank. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

142.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Directors failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

143.    Paysign has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Paysign any part of the damages Paysign suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

144.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by Paysign's officers and directors, and these acts are incapable of ratification.

146.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Paysign. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Paysign, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

147.    If there is no directors' and officers' liability insurance, then the Directors will not cause Paysign to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

148.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff

specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

151.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

153.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

154.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be

artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

155.    Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

156.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and approval of the 2018 Incentive Compensation Plan.

157.    The false and misleading elements of the 2019 Proxy Statement led to the approval of the 2018 Incentive Compensation Plan and to the re-election of Defendants Newcomer, Spence, Herman, Henry, Mina, Triplett, and Williams to the Board, which allowed them to continue breaching their fiduciary duties to Paysign.

158.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

159.    Plaintiff on behalf of Paysign has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

160.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Paysign's business and affairs.

162.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Paysign.

164.   In breach of their fiduciary duties owed to Paysign, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

165.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

166.    In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

167.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures, internal controls, and IT general controls, and caused the Company to fail to timely file with the SEC the 2019 10-K.

168.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Paysign's securities and disguising insider sales.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Paysign's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

170.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Paysign has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.     Plaintiff on behalf of Paysign has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

173.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Paysign.

175.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Paysign that was tied to the performance or artificially inflated valuation of Paysign, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

176.     Plaintiff, as a shareholder and a representative of Paysign, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.     Plaintiff on behalf of Paysign has no adequate remedy at law.

Verified Amended Shareholder Derivative Complaint

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

178.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

179.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

180.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

181.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

182.    Plaintiff on behalf of Paysign has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Paysign, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Paysign;

(c)     Determining and awarding to Paysign the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Paysign and the Individual Defendants to take all necessary actions to

reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Paysign and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

    2.  a provision to permit the shareholders of Paysign to nominate at least four candidates for election to the Board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Paysign restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.Dated:

Dated: September 15, 2020

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

Karl H. Smith, Esq.
Nevada Bar #6504
COULTER HARSH LAW
403 Hill St.,
Reno NV 89501
P: 775.324.3380
F: 775.324.3381
*Counsel for Plaintiff*

Verified Amended Shareholder Derivative Complaint

## **VERIFICATION**

I, Andrzej Toczek am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _9/8/2020_____, 2020.

Andrzej Toczek