**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ANDRZEJ TOCZEK and JOHN K. GRAY, derivatively on behalf of PAYSIGN, INC., | Case No. 2:20-cv-01722-JCM-NJK |
| Plaintiff, | **PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| vs. | |
| MARK R. NEWCOMER, MARK ATTINGER, DANIEL H. SPENCE, JOAN M. HERMAN, DAN R. HENRY, BRUCE A. MINA, DENNIS TRIPLETT, and QUINN WILLIAMS, | |
| Defendants, | |
| and | |
| PAYSIGN, INC., | |
| Nominal Defendant. | |

## <u>MOTION</u>

Pursuant to Federal Rule of Civil Procedure 23.1(c), and upon the Stipulation and Agreement of Settlement (the "Stipulation") dated November 26, 2024, attached as Exhibit 1 to the Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement filed concurrently herewith, plaintiffs Andrzej Toczek and John K. Gray (together, the "Nevada Plaintiffs"), derivatively on behalf of Paysign, Inc. ("Paysign" or the "Company") respectfully move this Court for entry of an Order in the form attached as Exhibit B to the Stipulation (the parties' proposed "Preliminary Approval Order"):

1. Granting preliminary approval of the proposed settlement (the "Settlement") on the terms set forth in the Stipulation;

2. Approving the proposed substance and form of the Notice and Summary Notice, attached as

Exhibits C and D to the Stipulation;[1]

3.  Preliminarily approving Plaintiffs' Counsel's unopposed Fee and Expense Amount; and

4.  Scheduling a Settlement Hearing date.

For the reasons set forth in the Stipulation and the accompanying Memorandum and Points of Authorities in Support, Nevada Plaintiffs respectfully request that the Court find that the proposed Settlement merits preliminary approval.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Nevada Plaintiffs are pleased to present for preliminary approval the proposed Settlement as set forth in the Stipulation.  If approved, the Settlement would fully resolve the above-captioned consolidated shareholder derivative action (the "Nevada Action") brought for the benefit of Paysign, as well as the substantially similar shareholder derivative actions brought by plaintiff Simone Blanchette ("Blanchette" and together with the Nevada Plaintiffs, "Plaintiffs") captioned *Blanchette v. Paysign, Inc. et al.*, Case No. 2:23-cv-01632-JCM-BNW, pending in this Court (the "*Blanchette* Action), and plaintiff Mo Jeewa ("Jeewa"), captioned *Jeewa v. Newcomer, et al.*, Case No. 2:23-cv-02129-RFB-EJY pending in the Court (the "*Jeewa* Action," and together with the Nevada Action and the *Blanchette* Action, the "Derivative Actions"). The Derivative Actions assert claims on behalf of Paysign against the Individual Defendants[2] for alleged violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, unjust enrichment, and waste of corporate assets related to, *inter alia*, the Individual Defendants' dissemination of allegedly false and misleading statements regarding Paysign's information technology ("IT") controls, disclosure controls, and internal controls over its financial reporting. (Stip. §I.)

[1]    Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Stipulation attached hereto as Exhibit 1, and all emphasis is added, and internal quotation marks and citations are omitted.

[2]    "Individual Defendants" means Mark R. Newcomer, Mark Attinger, Daniel H. Spence, Joan M. Herman, Dan R. Henry, Bruce A. Mina, Dennis Triplett, and Quinn Williams.

2

The Settlement is the product of hard-fought, arm's-length negotiations by experienced and knowledgeable counsel with the assistance of Michelle Yoshida, Esq. ("Ms. Yoshida" or the "Mediator") of Phillips ADR Enterprises ("PADRE"), a well-respected neutral with extensive experience mediating complex shareholder disputes. The substantive consideration for the Settlement takes the form of a series of material, long-term corporate governance reforms (the "Reforms") which are carefully tailored to increase the Company's focus and oversight on its operations and public reporting, and which are designed to prevent recurrence of the same or similar alleged misconduct and corporate injuries at issue in the Derivative Actions. While the Defendants deny any wrongdoing (Stip. §III), the Company and its board of directors (the "Board") have acknowledged and agreed that the Reforms confer substantial benefits upon Paysign and its stockholders (Stip. ¶2.2), the value of which falls well within the range that might be approved as fair, reasonable, and adequate, particularly in light of the significant costs, risks, delays, and management distraction that would be entailed in any attempt to secure a superior recovery through further litigation.

Pursuant to the Settlement, Paysign's Board shall adopt resolutions and amend Board committee charters, corporate governance documents, and/or the Company's Bylaws[3] to ensure the adoption, implementation, and maintenance of the Reforms, which shall remain in effect for no less than five (5) years. (Stip. ¶2.1.) The Reforms are designed to address and prevent similar misconduct and corporate injury as that alleged in the Derivative Actions, and include, *inter alia*: the establishment of a new management-level Information Technology Development Committee (the "TDC"), an independent outside auditor rotation policy, enhancements to the charter of the Audit Committee, improvements to the Chief Compliance Officer ("CCO") position, the establishment of a new, management-level Disclosure Committee, improved insider trading controls, and the establishment of a compensation clawback policy (the "Clawback Policy"). The Reforms are detailed in Exhibit A to the Stipulation.

The Reforms directly and comprehensively address the alleged lapses in governance, monitoring, internal controls, oversight, and disclosure that Plaintiffs contend permitted the alleged wrongdoing and

---

[3]    The term "Bylaws" refers to the Second Amended and Restated Bylaws of Paysign, Inc. (dated March 7, 2024).

corporate injury to occur, thereby significantly reducing the likelihood of recurrence and laying the foundation necessary to restore and maintain Paysign's reputation and investor confidence in the integrity of Paysign's corporate disclosures. Paysign acknowledges and agrees that the filing, pendency, and settlement of the Derivative Actions was the cause of the Company's decision to adopt, implement, and maintain the Reforms, and that the Reforms confer substantial benefits upon Paysign and its stockholders. (Stip. ¶2.2.)

Only after agreeing in principle on the material terms of the Settlement did the Parties negotiate, with substantial assistance from the experienced, nationally reputed Mediator, Plaintiffs' Counsel's attorneys' fees and expenses that would be payable by Defendants' insurers, subject to approval by the Court, in recognition of the substantial benefits conferred on the Company by the Reforms due to the efforts of Plaintiffs' Counsel. (Stip. §I.E.) On October 4, 2024, the Parties agreed that Defendants' insurers will pay $607,500.00 in attorneys' fees and expenses (the "Fee and Expense Amount") to Plaintiffs' Counsel, subject to Court approval. (*Id.*) Plaintiffs' Counsel also seeks modest service awards in the amount of $2,000.00 (the "Service Awards") to be paid to each of the Plaintiffs from the Fee and Expense Amount, in recognition of Plaintiffs' participation and effort in the prosecution of the Derivative Actions. (Stip. ¶4.4.)

At the preliminary approval stage, the Court need only determine that the proposed Settlement falls within a range that might ultimately be found to be fair, reasonable, and adequate, such that notice of the Settlement should be provided to Current Paysign Stockholders, and that the Settlement Hearing should be scheduled for consideration of final settlement approval. The Settlement plainly meets this standard. The Settlement guarantees substantial benefits that will confer significant value upon the Company over the course of many years, and is fair and reasonable, particularly when balanced against the costs, risks, delay, and disruption that would be entailed in continued litigation. Moreover, the Settlement process was fair and not collusive. The Settlement is the product of the full-day Mediation overseen by Ms. Yoshida and additional months of hard-fought negotiations among the Parties, each represented by experienced, well-informed counsel, facilitated by a respected neutral familiar with the relevant law and particular subject matter. The proposed form and manner of notice and the schedule for

consideration of final approval meet applicable standards, as they inform Current Paysign Stockholders of the Settlement's essential terms and afford a fair opportunity for comment and objection.

Accordingly, for the reasons set forth herein and in the record, the Nevada Plaintiffs respectfully request that the Court: (1) enter the Parties' proposed Preliminary Approval Order annexed to the Stipulation as Exhibit B, thereby granting preliminary approval of the proposed Settlement and finding, at this preliminary stage, that it is fair, reasonable, and adequate; (2) approve the Parties' proposed form and manner of providing Notice to Current Paysign Stockholders, annexed to the Stipulation as Exhibits C and D, and find that such Notice constitutes the best notice practicable under the circumstances, constitutes due and sufficient notice of the matters set forth in the Notice to all Persons entitled to receive notice, and fully satisfies the requirements of due process, Fed. R. Civ. P. 23.1, and all other applicable laws and rules; and (3) schedule a Settlement Hearing on a date at least forty-five (45) calendar days after entry of an Order preliminarily approving the Settlement in order to determine: (i) whether the Settlement should be approved as fair, reasonable, and adequate; and (ii) whether a final judgment should be entered that is in substance materially the same as the Parties' proposed order annexed to the Stipulation as Exhibit E, dismissing with prejudice the Nevada Action.

Defendants do not oppose the Motion or any of the requested relief.

## II.    **FACTUAL BACKGROUND**

### A.  **Summary of Allegations**

Nominal defendant Paysign is a card payment solutions provider and an integrated payment processor based in Henderson, Nevada, which services prepaid debit cards sponsored by other companies. (¶2.[4]) The Company earns revenue from services such as transaction processing, cardholder enrollment, value loading, account management and customer service-related activities. (*Id.*)

On March 16, 2020, the Company announced a delay in the filing of its 2019 10-K due to a material weakness in its internal controls over financial reporting and IT general controls. (¶8.) On this news, the price of Paysign's common stock declined by nearly 17% from its previous day closing price of $5.52 per

---

[4]    Unless otherwise noted, references herein to "¶__" or "¶¶__" are to the Verified Stockholder Derivative Complaint filed by Plaintiff John K. Gray on May 9, 2022. (ECF No. 1)

share to close at $4.59 per share on March 16, 2020. (*Id.*) The price of Paysign's common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020. (*Id.*)

On March 31, 2020, Paysign issued a press release announcing that the Company would postpone its earnings results call scheduled for that same day "to complete its year-end closing procedures." (¶9.) On this news, the price of Paysign's common stock declined by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020. (*Id.*) The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share. (*Id.*)

In April 2020, the Company disclosed that material weaknesses in its internal controls over financial reporting existed as of December 31, 2019, including "lack[ing] sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the [SEC] who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018, and 2019." (¶10.) As for its IT general controls, the Company disclosed that the material internal controls weaknesses related to software updates. (*Id.*)

Plaintiffs allege that, *inter alia*, between March 12, 2019 through September 17, 2020, at least, the Individual Defendants breached their fiduciary duties by issuing and/or causing the Company to issue materially false and misleading statements (including by soliciting a materially false and misleading proxy statement in violation of Section 14(a) of the Exchange Act) and by failing to disclose material facts to the public regarding, among other things, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 Annual Report on SEC Form 10-K and holding its 2019 year-end earnings call. (Stip. §I.) The Derivative Actions also allege that the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while certain of the Individual Defendants engaged in insider sales.[5]

---

[5]      Based on these events and disclosures, a securities class action was filed in this Court against the Company and certain of the Individual Defendants for violations of the Exchange Act, alleging

1   (*Id.*)

2   **B. Procedural History**

3   **1.  The Nevada Action**

4   On September 17, 2020, plaintiff Toczek filed a Verified Shareholder Derivative Complaint on

5   behalf of nominal defendant Paysign in this Court alleging claims for breaches of fiduciary duty, unjust

6   enrichment, and waste of corporate assets under Nevada state law, and for violations of Section 14(a) of

7   the Exchange Act, against the Individual Defendants, in a case styled as *Toczek v. Newcomer, et al.*,

8   Case No. 2:20-cv-01722-JCM-NJK (the "*Toczek* Action"). (ECF No. 1).  On May 9, 2022, plaintiff Gray

9   filed a substantially similar Verified Stockholder Derivative Complaint on behalf of nominal defendant

10  Paysign against the Individual Defendants, in a case styled as *Gray v. Attinger, et al.*, Case No. 2:22-cv-

11  00735-GMN-VCF (the "*Gray* Action"). (*Gray* Action, ECF No. 1).

12  On April 20, 2023, nominal defendant Paysign filed an Unopposed Motion to Consolidate

13  Related Cases in the Court, requesting that the Court consolidate the *Toczek* and *Gray* Actions. (ECF

14  No. 22).  On May 10, 2023, the Court issued an order granting the Unopposed Motion to Consolidate

15  Related Cases, thereby consolidating the *Toczek* and *Gray* Actions for all purposes under Case No. 2:20-

16  cv-01722-JCM-NJK (forming the Nevada Action). (ECF No. 23).

17  **2.  The *Blanchette* Action**

18  On October 1, 2023, plaintiff Blanchette filed a Verified Shareholder Derivative Complaint on

19  behalf of Paysign in the Eighth Judicial District Court, Clark County, Nevada asserting claims for

20  violations of Section 10(b) of the Exchange Act, as well as for breaches of fiduciary duty, unjust

21  enrichment, aiding and abetting breach of fiduciary duty, and gross mismanagement against the

22

23  substantially the same false and misleading statements that are alleged in the Derivative Actions, captioned

24  *Shi v. Paysign, Inc. et al.*, Case No. 2:20-cv-00553-GMN-DJA (the "Securities Class Action").  On
    January 12, 2021, the lead plaintiffs in the Securities Class Action filed an amended complaint for

25  violations of the Exchange Act against the Company and defendants Newcomer, Attinger, and Spence.
    (Securities Class Action, ECF No. 22).  On February 9, 2023, U.S. District Judge Gloria M. Navarro

26  denied, in part, the defendants' motion to dismiss in the Securities Class Action. (Securities Class Action,
    ECF No. 42). On December 15, 2023, the parties to the Securities Class Action executed a Stipulation of

27  Settlement. (Securities Class Action, ECF No. 63-2). On April 18, 2024, the Court granted final approval

28  of the settlement of the Securities Class Action. (Securities Class Action, ECF No. 69).

Individual Defendants. (*Blanchette* Action, ECF No. 1-1). Defendants' counsel in the *Blanchette* Action accepted service on behalf of all Defendants and, on October 10, 2023, removed the *Blanchette* Action to the Court pursuant to 28 U.S.C. §§ 1441, 1446. (*Blanchette* Action, ECF No. 1).

On November 8, 2023, the parties to the *Blanchette* Action agreed to stay the *Blanchette* Action until December 7, 2023, to complete discussions with counsel for Nevada Plaintiffs in the Nevada Action and with counsel for Defendants regarding coordination of the Derivative Actions, which stay the Court so ordered on November 15, 2023. (*Blanchette* Action, ECF Nos. 10, 11).

On December 7, 2023, the parties to the *Blanchette* Action filed an updated status report indicating that the Parties had made substantial progress towards the potential settlement of the Nevada Action, which would include the *Blanchette* Action, and requested that the *Blanchette* Action be stayed for sixty (60) days pending the completion of the settlement negotiations of the Nevada Action, which request the Court so granted on December 11, 2023. (*Blanchette* Action, ECF Nos. 12, 13). The parties to the *Blanchette* Action made a similar request to extend the stay on January 29, 2024, which the Court so ordered on February 2, 2024. (*Blanchette* Action, ECF Nos. 14, 15).

On March 28, 2024, the parties to the *Blanchette* Action filed a Joint Status Report, informing the Court, *inter alia*, that the Parties had made significant progress towards reaching a settlement. (*Blanchette* Action, ECF No. 16). The parties to the *Blanchette* Action requested that the Court stay the *Blanchette* Action for an additional sixty (60) days, until May 29, 2024, which the Court so ordered on April 1, 2024. (*Blanchette* Action, ECF Nos. 16, 17).  On July 27, 2024, the parties to the *Blanchette* Action filed a further Joint Status Report informing the Court that as of that time a settlement had not been reached, and setting forth a proposed briefing schedule on Defendants' anticipated motion to dismiss.  Subsequent to the filing of that Joint Status Report, as set forth below, the Parties reached agreement on the proposed Settlement.

### 3.  The *Jeewa* Action

On May 28, 2021, plaintiff Mo Jeewa ("Jeewa") made a pre-suit litigation demand on the Board to investigate and bring action against the Individual Defendants for, *inter alia*, breach of their fiduciary duties. (Stip. §I.D.) On June 10, 2021, Paysign responded by letter, advising Jeewa of the existence of

the *Toczek* Action, which made essentially the same allegations. (*Id.*) Paysign invited Jeewa to share with the Board any information he deemed relevant to the Board's consideration, and said that Paysign would consider Jeewa's demand. (*Id.*)

Jeewa next wrote to Paysign on May 16, 2022, asking for an update. *Id.* Paysign responded on June 9, 2022, informing Jeewa of the filing of the *Gray* Action, and again inviting Jeewa to share with the Board any information he deemed relevant. (*Id.*) Jeewa responded that same day, saying he would share information whenever he deemed it appropriate. (*Id.*) On July, 20, 2022 Paysign informed Jeewa that in light of the existence of the *Toczek* and *Gray* Actions which preserved Plaintiffs' derivative claims, it saw no point in pursuing certain tolling agreements Jeewa was asking Paysign to pursue. (Stip. §I.D.)

Jeewa wrote again on April 17, 2023 and on June 21, 2023, repeating his demand that the Board take immediate action, and on June 28, 2023 Paysign repeated its view that Jeewa's allegations were essentially identical to those asserted in the Nevada Action, and said its Board "continues to monitor developments in both the Securities Class Action, and the Derivative Litigation, in deciding Paysign's best course of action." (*Id.*)

On December 27, 2023, plaintiff Jeewa filed a Verified Stockholder Derivative Complaint in the Court, raising claims for breach of fiduciary duty, breach of fiduciary duty for wrongful refusal, and unjust enrichment against the Individual Defendants and alleging that the Board wrongfully refused plaintiff Jeewa's demand. (*Jeewa* Action, ECF No. 1).

**C. Settlement Negotiations**

In April 2023, the Parties to the Nevada and *Blanchette* Actions agreed to mediate in connection with the Derivative Actions, in order to attempt to resolve the claims asserted therein. (Stip. §I.E.) The Mediation was scheduled for May 10, 2023, to be overseen by Ms. Yoshida of PADRE. (*Id.*)

On April 18, 2023, the Nevada Plaintiffs sent a settlement demand letter to Defendants which, *inter alia*, proposed a settlement framework that included a comprehensive set of corporate governance reforms designed to address the governance deficiencies that resulted in the wrongdoing alleged in the Nevada Action. (*Id.*) Moreover, in anticipation of the Mediation, the Parties submitted to the Mediator

and exchanged with each other detailed mediation statements, addressing relevant arguments and allegations in the Derivative Actions. (*Id.*)

On May 10, 2023, the Parties in the Nevada Action and the *Blanchette* Action participated in the full-day Mediation with the Mediator. (*Id.*) The Parties were unable to reach an agreement on settlement at the Mediation but continued to engage in settlement negotiations in the following months. (Stip. §I.E.) Ultimately, on November 21, 2023, the Parties were able to reach an agreement in principle on the substantive terms of the Settlement, including the Reforms that Paysign would adopt as consideration for the Settlement. (*Id.*)

After the Parties reached an agreement in principle on the material terms of the Settlement, the Parties separately negotiated at arm's length, with the Mediator's assistance, the attorneys' fees and expenses to be paid to Plaintiffs' Counsel in consideration of the substantial benefits conferred on the Company by the Reforms due to the efforts of Plaintiffs' Counsel. (*Id.*) Following protracted negotiations, on October 4, 2024, the Parties agreed that Defendants' insurers will pay the Fee and Expense Amount of $607,500 to Plaintiffs' Counsel, subject to Court approval. (*Id.*)

## III.    **THE SETTLEMENT TERMS**

The Settlement commits the Board to adopting resolutions and amending Board committee charters, corporate governance documents, and/or PaySign's Bylaws to ensure the adoption, implementation, and maintenance of the Reforms, which shall remain in effect for no less than five (5) years. The Reforms, detailed in Exhibit A to the Stipulation, are designed to prevent the reoccurrence of the alleged misconduct at issue in the Derivative Actions, including the decision-making processes and oversight lapses which Plaintiffs contend damaged Paysign. In sum, per the Reforms:

- Paysign shall establish the management-level TDC, which shall be responsible for overseeing key technological initiatives and the design, development, implementation, and maintenance of Paysign's IT, including Paysign's primary software relating to management of its customers' accounts, and the remediation of issues and challenges related thereto. The TDC's duties include, *inter alia,* (i) meeting with relevant engineering teams at least once quarterly, at which time each team shall report to the TDC on the team's activities, progress, challenges, and developments as they relate to Paysign's IT, (ii) ensuring proper compliance with an established protocol or internal control mechanism for testing proposed software designs and or proposed changes to existing software designs; and (iii) assisting the Disclosure Committee with the review

and disclosure of material information concerning the performance, capabilities, or other technical details of Paysign's software to ensure that Paysign's public statements about its software comply with applicable laws and regulations.

- The Board shall adopt a policy to rotate Paysign's independent auditing firm every eight (8) years.

- Paysign shall adopt a resolution to amend its Audit Committee Charter to ensure Paysign's audit processes and procedures are effective and adequately overseen. Amendments shall include requiring the Audit Committee to, *inter alia*: (i) meet at least six (6) times annually and in separate executive sessions with Paysign's management (including the CRO), independent auditor, and internal auditor in carrying out its duties, and meet quarterly in separate sessions with the CLO and outside counsel to review any legal matters pertinent to carrying out its duties; (ii) review Paysign's Code of Ethics ("Code of Ethics") with the assistance of the CCO at least annually, in monitoring compliance with the Code of Ethics; and (iii) solicit the input of department representatives as necessary to review the accuracy of public disclosures related to issues within their expertise.

- The Board shall direct Paysign to amend the responsibilities of the CCO, which will report to the full Board and its committees. The CCO's duties shall include, to the extent they already exist, oversight and administration of Paysign's corporate governance policies (including the Code of Ethics), fostering a culture that integrates compliance and ethics into business processes and practices through awareness and training, maintaining and monitoring a system for accurate public and internal disclosures and reporting and investigating potential compliance and ethics concerns. The CCO shall be primarily responsible for managing Paysign's ethics and compliance program and assisting the Board in fulfilling its oversight duties with regard to Paysign's compliance with applicable laws, regulations, and accounting standards, and the dissemination of true and accurate information.

- Paysign shall create a new, separate, management-level Disclosure Committee that establishes effective procedures and protocols at Paysign relating to financial disclosures, to ensure that all of Paysign's significant public statements, including, but not limited to, SEC filings, material press releases, and Paysign's significant statements to non-Company individuals at public or private meetings, are reviewed for accuracy, integrity, and completeness, and for reviewing with management its ongoing compliance with these protocols and procedures.

- Paysign shall post the Insider Trading Policy on its website, and the Board shall require that all insider transactions be made subject to Rule 10b5-1 trading plans.

- Paysign shall adopt a resolution to amend its Governance Committee Charter, which shall require, *inter alia,* the Governance Committee to meet with each prospective new Board member prior to his or her nomination to the Board and then recommend whether such individual shall be nominated for membership to the Board, and for such review to include a background check.

- Paysign shall adopt a resolution to amend the Compensation Committee Charter, which shall require, *inter alia,* that (i) in determining, setting, or approving annual short-term compensation arrangements, the Compensation Committee take into account the particular executive's performance as it relates to both legal compliance and compliance with internal policies and procedures; and (ii) in determining, setting, or approving termination benefits and/or separation pay to executive officers, the Compensation Committee to take into consideration the circumstances surrounding the particular executive officer's departure and the executive's performance as it relates to both legal compliance and compliance with internal policies and procedures.

- Paysign shall implement an annual employee training program, which shall be mandatory for all directors, officers, employees, independent contractors, and agents of Paysign, and which shall include coverage of risk assessment and compliance, Paysign's Code of Ethics, Insider Trading Policy, various compensation policies, and any and all other manuals or policies established by Paysign concerning legal or ethical standards of conduct to be observed in connection with work performed for Paysign.

- The Board shall adopt certain reforms relating to its composition and practices, including, *inter alia,* limitations on service by independent directors on boards of other public companies and director term limits.

- Paysign's Bylaws shall be amended, as necessary, to provide that at least a majority of the Board shall consist of directors who meet the criteria for director independence set forth by the NASDAQ Listing Rules, and any other statutory director independence requirement, as well as certain other qualifications.

- Paysign shall establish a specific policy addressing measures taken to promote Board diversity.

- Paysign shall include a standalone whistleblower policy (the "Whistleblower Policy") on its website and to the extent it does not do so already, shall amend the Whistleblower Policy so as to, *inter alia,* encourage interested parties to bring forward ethical and legal violations and/or a reasonable belief that ethical and legal violations have occurred to the parties identified in the Code of Ethics, the CCO, Human Resources Manager, Audit Committee, and/or the third-party reporting service provider so that action may be taken to resolve the problem.

- The Company shall adopt (or will have already adopted) the Clawback Policy, which shall apply to, *inter alia,* certain incentive-based compensation, determination of erroneously-awarded compensation, and recovery of erroneously-awarded compensation.

Paysign and the Board have acknowledged and agreed that the filing, pendency, and settlement of the Derivative Actions was the cause of the Company's decision to adopt, implement, and maintain the

1   Reforms.   Paysign and the Board have further acknowledged and agreed that the Reforms confer

2   substantial benefits to Paysign and its shareholders.

3   **IV.**   **LEGAL STANDARDS**

4       Federal Rule of Civil Procedure ("Rule") 23.1(c) provides that "[a] derivative action may be settled

5   ... only with the court's approval." There is a strong judicial policy favoring settlement. *In re Pac. Enters.*

6   *Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th

7   Cir. 1992) ("strong judicial policy…favors settlements" in complex cases); *Officers for Justice v. Civil*

8   *Serv. Comm'n*, 688 F.2d 615, 635 (9th Cir. 1982) ("settlement process [is] favored in the law"); *U.S. v.*

9   *McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("there is an overriding public interest in settling and quieting

10  litigation"). Settlement of shareholder derivative actions is particularly favored because such litigation is

11  "notoriously difficult and unpredictable." *In re NVIDIA Corp. Derivative Litig.*, Master File No. C-06-

12  06110-SBA (JCS), 2008 U.S. Dist. LEXIS 117351, at *7 (N.D. Cal. Dec. 19, 2008); *see also In re Wells*

13  *Fargo & Co. S'holder Derivative Litig.*, 2019 U.S. Dist. LEXIS 240004, at *21 (N.D. Cal. May 19, 2019)

14  ("courts have recognized that it is often difficult for plaintiffs to prevail in derivative actions").

15      The approval of a proposed derivative settlement is a two-step process—preliminary approval

16  followed by a final approval hearing. *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-SKV, 2021 U.S.

17  Dist. LEXIS 239909, at **11-12 (W.D. Wash. Nov. 12, 2021). At the preliminary approval stage, the

18  court's evaluation of proposed settlement terms is "limited to the extent necessary to reach a reasoned

19  judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the

20  negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all

21  concerned." *Officers for Justice*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027

22  (9th Cir. 1998); *Hunichen*, 2021 U.S. Dist. LEXIS 239909, at *3 (holding that Court need only determine

23  whether a proposed settlement is "within the range of possible approval" as fair, reasonable and adequate

24  and that notice should be sent to shareholders). "Preliminary approval amounts to a finding that the terms

of the proposed settlement warrant consideration by [Current Paysign Stockholders] and a full examination at a final hearing." *Hunichen,* 2021 U.S. Dist. LEXIS 239909, at *3. Following preliminary approval and notice, the Court reviews the fairness of the settlement at a final fairness hearing and, if appropriate, renders a finding that the settlement is "fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e)(2).

Thus, at this preliminary stage, the Court need only conclude that the Settlement is within the range of possible approval for the purposes of providing notice to Current Paysign Stockholders and holding the Settlement Hearing.

## V.    THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Plaintiffs respectfully submit that the Settlement is within the range of possible approval and should therefore be preliminarily approved.

### A. The Settlement Is the Result of Good Faith, Arm's-Length Negotiations

Settlements achieved through extensive, arm's-length negotiations conducted by experienced, well-informed counsel enjoy a presumption of fairness. *See, e.g., Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."); *Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2015 U.S. Dist. LEXIS 106183, at *14 (N.D. Cal. Aug. 12, 2015) ("'An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining'"). Significant weight is accorded to the parties' belief that the litigation should be settled on the proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Pac. Enters.*, 47 F.3d at 378.

Here, the Settlement was negotiated between experienced counsel possessing a firm understanding of the strengths and weaknesses of the claims and defenses asserted, is the product of significant give and take by the Parties, and was reached after many months of hard-fought negotiations, including the full-

day Mediation with an experienced neutral and extensive subsequent negotiations. (Stip., §§I.E, II.)

Each of the settling Parties was represented by zealous and able counsel with extensive experience in complex derivative litigation who were fully informed regarding the facts and the law applicable to the core claims and defenses. In addition, Plaintiffs' Counsel have thoroughly considered the facts and law underlying the Derivative Actions and have conducted substantial investigation and analysis relating to the claims and the underlying events alleged in the Derivative Actions including, *inter alia*, (i) reviewing and analyzing Paysign's press releases, public statements, and filings with the SEC; (ii) reviewing and analyzing securities analysts' reports and advisories and media reports about the Company; (iii) reviewing and analyzing the pleadings and orders in the Securities Class Action; (iv) researching the applicable law with respect to the claims alleged and the potential defenses thereto; (v) preparing and filing initial complaints in the Derivative Actions; (vi) researching and evaluating factual and legal issues relevant to the claims; (vii) engaging in settlement negotiations with Defendants' counsel regarding the specific facts, and perceived strengths and weaknesses of the Derivative Actions, and other issues in an effort to facilitate negotiations; (viii) researching the Company's corporate governance structure in connection with settlement efforts; (ix) preparing comprehensive written settlement demands and modified demands over the course of the Parties' settlement negotiations; (x) preparing a mediation statement; (xi) participating in the full-day Mediation, and (xii) negotiating and drafting the comprehensive Stipulation.  (Stip. §II.) The accumulation of the information discovered through the above efforts permitted Plaintiffs and Plaintiffs' Counsel to be well-informed about the strengths and weaknesses of the derivative claims and to engage in effective settlement negotiations with Defendants.

Moreover, the Parties' agreement that the Reforms confer substantial benefits to Paysign and its shareholders, (Stip. ¶2.2) further supports that the Settlement is within the range of what may be approved as fair, reasonable, and adequate, and should be granted preliminary approval. *See In re First Cap. Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992)

(finding the belief of counsel that the proposed settlement represented the most beneficial result for the class to be a compelling factor in approving settlement); *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.").

In addition, the negotiations were structured to eliminate potential conflicts of interest and to ensure fairness. Paysign was represented by experienced counsel at every phase of the negotiations, which were facilitated by the experienced private Mediator who was familiar with the relevant law and the specific subject matter. Additionally, attorneys' fees were not addressed until the Parties had reached agreement on the substantive consideration for the Settlement. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement ... helps to ensure that the proceedings were free of collusion"); *Todd v. STAAR Surgical Co.,* 2017 U.S. Dist. LEXIS 176183, at *6 (C.D. Cal. Oct. 24, 2017) (approving settlement facilitated by "experienced mediator Michelle Yoshida of Phillips ADR"); *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2021 U.S. Dist. LEXIS 50550, at *44 (N.D. Cal. Mar. 17, 2021) ("extensive arm's-length negotiations between experienced counsel, including several in-person mediation sessions and additional negotiations facilitated by" a mediator rules out collusion); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, Lead Case No. 07-cv-2245-MMA, 2010 U.S. Dist. LEXIS 109409, at **7-8 (S.D. Cal. Oct. 14, 2010) ("negotiations for several months ... and the active involvement of the mediator ... weighs considerably in favor of concluding this is not a collusive settlement"); *Satchell v. Fed. Express Corp.*, No. C03-2659-SI, 2007 U.S. Dist. LEXIS 99066, at *17 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced mediator ... confirms that the settlement is non-collusive").

## B.  The Settlement Is Well Within the Range of Possible Approval

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by

the corporation, the real party in interest." *In re Pinterest Derivative Litig.*, No. C 20-08331-WHA, 2022 U.S. Dist. LEXIS 103528, at *6 (N.D. Cal. June 9, 2022); *In re OSI Sys., Inc. Derivative Litig.*, No. CV-14-2910-MWF, 2017 U.S. Dist. LEXIS 221033, at **5-6 (C.D. Cal. May 2, 2017); *see also In re Apple Computer, Inc. Derivative Litig.*, 2008 U.S. Dist. LEXIS 108195, at *8 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider … is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation"). Courts may weigh a variety of other factors, including: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017); *Hanlon*, 150 F.3d at 1026.

   As the U.S. Supreme Court has held, "a corporation may receive a substantial benefit" from "corporate therapeutics" that "furnish a benefit to all stockholders," "regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970). In fact, "the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor." *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983); *see also NVIDIA*, at **5-6 ("[S]trong corporate governance is fundamental to the economic well-being and success of a corporation"); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Courts have recognized that corporate governance reforms ... provide valuable benefits to public companies."). Courts routinely approve settlements where corporate governance reforms are designed effectively to prevent the same or similar alleged wrongdoing that precipitated the litigation. *See, e.g.*, *In re Apple Computer, Inc. Derivative Litig.*,; *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (finding corporate governance reforms "sufficiently beneficial" to warrant settlement approval and fee award); *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement where therapeutics "significantly improved institutional structure for detecting and

1    rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company").

2        The Reforms confer substantial benefits on Paysign, thus meriting preliminary approval of the

3    Settlement. *See supra*, section III. Here, the proposed Settlement provides material Reforms to Paysign's

4    corporate policies directly aimed at strengthening internal controls and governance practices so that, *inter*

5    *alia*, the Board and the Company's executive officers may adequately oversee and monitor Paysign's

6    operations and public reporting, and thereby avoid further damage as resulted from the alleged misconduct

7    in the Derivative Actions.  The comprehensive set of Reforms will make it "far less likely [that the

8    corporation will] become subject to long and costly securities litigation in the future, as well as prosecution

9    or investigation by regulators or prosecutors." *Cohn*, 375 F. Supp. 2d at 853. Indeed, the Reforms confer

10   further economic value upon Paysign and its stockholders by enacting more rigorous, independent, and

11   effective oversight, which will improve corporate decision-making and execution of key corporate

12   strategies; ensure accurate disclosures; and reduce the costs associated with failure to comply with

13   disclosure and other legal or regulatory requirements. Moreover, the Reforms confer economic value by

14   laying the foundation necessary to enhance investor confidence in the accuracy of the Company's public

15   disclosures, the integrity of its management, and the independence and effectiveness of the Company's

16   corporate governance and Board oversight and monitoring. Indeed, research by academics and leading

17   business advisors confirms what directors of leading corporations and institutional investors know from

18   experience: investors pay a premium for stock in companies with strong corporate governance relative to

19   peer companies perceived to have weaker governance because strong governance correlates with long-

20   term value creation.[6]

21   _____

22   [6]    *See, e.g.*, Lucian A. Bebchuk & Assaf Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009); Paul A. Gompers, Joy L. Ishii & Andrew Metrick, *Corporate Governance and Equity Prices*, 118 Quarterly J. Econ. (2003); Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between Corporate Governance and Company Performance*, Institutional Shareholder Services (2004); Vincent Cunat, Mireia Gine, & Maria Guadalupe, *The Vote is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance, Oct. 2012.

In sum, the Parties agree that the Reforms provide a substantial benefit to Paysign and its stockholders. Paysign has agreed to maintain the Reforms for a minimum of five years, which provides ample time to ensure that the Reforms become embedded in the Company's policies, practices, and corporate culture, with continuing benefits even after the expiration of the five-year commitment term. *See Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance enhancements committed for at least three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

**C. The Risks and Expenses of Protracted Litigation Support Settlement**

In weighing the Settlement's benefits, courts recognize the limited utility of speculation about the possibility that further litigation might yield a materially better result. "[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Just.*, 688 F.2d at 624. "The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* "In assessing the Settlement, this Court must balance the benefits accorded to [the Company] and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation." *See Cohn*, 375 F. Supp. 2d at 855.

Here, the Settlement's guarantee of benefits described herein far outweighs the possibility that meaningfully superior benefits might be achieved through further litigation, particularly in light of the substantial costs, delays, and management distractions continued litigation would entail, and the substantial risk that further litigation would forfeit the Settlement's benefits and result in no recovery whatsoever. Although Plaintiffs believe the derivative claims are meritorious, the risks of continued prosecution of the Derivative Actions are substantial. "[T]he odds of winning [a] derivative lawsuit [a]re extremely small." *Pac. Enters.*, 47 F.3d at 378; *Cohn*, 375 F. Supp. 2d at 852; *Lewis*, 59 F.R.D. at 528. Had Plaintiffs continued to litigate, they would have faced the risk that the Derivative Actions may not have withstood challenges at the pleading stage, especially given the difficult standard for pleading

demand futility; demand futility under Delaware law, in particular, presents a significant pleadings-stage hurdle for derivative plaintiffs.[7] As the U.S. Supreme Court has recognized, the demand futility requirement is satisfied only under "extraordinary conditions[.]" *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991)). Here, Plaintiffs would need to establish demand futility as to at least four of the seven directors on Paysign's Board when the complaints were filed in the Derivative Actions, four of whom the Company deemed independent. (¶¶72-81.)

Even if Plaintiffs alleged demand futility successfully, the challenges before them would remain daunting, including, *inter alia*, (i) building a circumstantial case for liability based upon thousands of complex business and financial documents; (ii) proving actual damages in a battle of the experts; (iii) overcoming motions for summary adjudication; (iv) securing a favorable judgment at trial through circumstantial evidence comprised of complex corporate documents and the testimony of predominantly hostile percipient witnesses and contested expert testimony; (v) maintaining that judgment through post-trial motions and appeals; and (vi) enforcing any judgment as might be obtained. These challenges are amplified in shareholder derivative litigation, making it "notoriously difficult and unpredictable." *Maher*, 714 F.2d at 455; *Pac. Enters.*, 47 F.3d at 378 ("derivative lawsuits are rarely successful"); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 U.S. Dist. LEXIS 63260, at *15 (S.D.N.Y. Sept. 6, 2006) ("Even assuming that Plaintiffs were able to successfully establish the defendants' liability, they then would be tasked with proving highly contested damages."); *see also In re Apollo Grp., Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010) (evidence insufficient to support jury verdict for shareholders of $277 million). Moreover, the pre-trial discovery required to overcome these challenges would be exceedingly costly, complex, and

---

[7] Paysign is incorporated in the State of Nevada, so "Nevada law defines demand futility here. Nevada courts look to Delaware law for guidance on requirements for pleading demand futility." *Israni v. Bittman*, 473 App'x 548, 549 (9th Cir. 2012).

time-consuming, encompassing an enormous volume of documents, depositions of myriad fact witnesses, and preparation of expert reports and expert depositions. In addition, each step of the way, Defendants would continue in their vigorous defense with the assistance of their highly experienced counsel, Greenberg Traurig, LLP. The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery for Paysign after years of additional, expensive litigation. The Settlement's guarantee of the implementation and maintenance of the material Reforms with substantial long-term economic value well demonstrate that the Settlement falls within the range of reasonableness and should be preliminarily approved. *See In re Intel Corp. Derivative Litig.*, No. 09-867-JJF, 2010 U.S. Dist. LEXIS 74661, at **6-7 (D. Del. July 22, 2010) (governance benefits "outweigh the speculative potential of any monetary payment from the relevant insurance policies"); *In re AOL Time Warner S'holder Derivative Litig.*, Master File No. 02 Civ. 6302 (SWK), 2006 U.S. Dist. LEXIS 63260, at *16 (S.D.N.Y. Sept. 6, 2006) (settlement ensures prophylaxis following corporate injury and permits management to restore full attention to business); *Athan v. U.S. Steel Corp.*, 523 F. Supp. 3d 960, 967-68 (E.D. Mich. 2021) (settlement "fair and reasonable ... in relation to the potential risk and uncertain recovery").

## VI.    THE SEPARATELY NEGOTIATED FEE AND EXPENSE AMOUNT FOR PLAINTIFFS' COUNSEL IS FAIR AND REASONABLE

Only after negotiating and reaching an agreement in principle on the material terms of the Settlement did the Parties separately negotiate at arm's length, with the Mediator's assistance, the attorneys' fees and expenses to be paid to Plaintiffs' Counsel.  As a result of those arm's-length negotiations, the Parties agreed that Defendants' insurers will pay the Fee and Expense Amount to Plaintiffs' Counsel, subject to Court approval, in consideration of the substantial benefits conferred upon Paysign as a direct result of the Reforms and Plaintiffs' and Plaintiffs' Counsel's efforts in connection with the Derivative Actions.

While the Court need not address the agreed-to Fee and Expense Amount until the final approval

stage, it bears mention that the U.S. Supreme Court has endorsed this type of consensual resolution of attorneys' fees issues in these kinds of cases as the ideal toward which litigants should strive. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (negotiated fees strongly preferred) ("[a] request for attorney's fees should not result in a second major litigation"); *Mills,* 396 U.S. at 375 (holding that, under the "substantial benefit" doctrine, counsel who prosecute a shareholders' derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs). Further, the settlement process described above demonstrates the absence of any collusion. *See supra* at 9-10. When, as here, there is no evidence of collusion and no detriment to the parties, the Court "should give substantial weight to a negotiated fee amount." *Wehlage v. Evergreen at Arvin LLC*, No. 4:10-cv-05839-CW, 2012 U.S. Dist. LEXIS 144152, at *6 (N.D. Cal. 2012); *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 695 (N.D. Ga. 2001). The Court is not being called upon to fashion a fee and expense award; rather, it is being asked to determine whether the Fee and Expense Amount agreed to by well-represented Parties at arm's-length, and with the assistance of and pursuant to a recommendation by an experienced Mediator, falls within the range of reasonableness. *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994). Accordingly, Plaintiffs respectfully submit that the separately negotiated Fee and Expense Amount is fair and reasonable given the substantial benefits conferred by the Derivative Actions.

Plaintiffs' Counsel further submit that the nominal Service Awards in the amount of $2,000 to each Plaintiff to be drawn from the Fee and Expense Amount should be approved. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947-48 (9th Cir. 2015).

## VII.    THE PROPOSED NOTICE SATISFIES RULE 23.1 AND AFFORDS DUE PROCESS

Rule 23.1(c) accords "'wide discretion to the District Court as to the form and content of the notice'" of a derivative settlement to shareholders. *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1985); *Maher*, 714 F.2d at 450-51. Here, the Stipulation provides that within ten (10) days after the entry of the Preliminary Approval Order, Paysign shall: (1) post a copy of the Notice and

the Stipulation (and exhibits thereto) on the Investor Relations page of the Company's website; (2) publish the Summary Notice in a press release; and (3) file with or furnish to the SEC the Notice and Stipulation (and exhibits thereto) as exhibits to an SEC Form 8-K. The Notice shall provide a link to the Investor Relations page on Paysign's website where the Notice and Stipulation (and exhibits thereto) may be viewed, which page will be maintained through the date of the Settlement Hearing. *See, e.g., In re Healthcare Servs. Grp., Inc. Derivative Litig.*, No. 2:20-cv-03426-WB, 2022 U.S. Dist. LEXIS 134005, at *31 (E.D. Pa. July 27, 2022) (notice provided by filing a Form 8-K with the SEC and posting on the Company's investor relations webpage held to be adequate to satisfy due process).

"Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Here, the proposed Notices are accurate and informative. The Notices provides information on the terms and provisions of the Settlement, including the Fee and Expense Amount and Service Awards; the benefits the Settlement provides to the Company and its stockholders; the date, time, and place of the Settlement Hearing; the procedure and deadlines for objecting; and how and from whom to request more information.

## VIII.   **PROPOSED SCHEDULE**

As part of the Preliminary Approval Order, Plaintiffs propose the following schedule:

| | |
|---|---|
| Issuance of Company press release containing the contents of the Summary Notice | Within 10 days after the Court enters the Preliminary Approval Order |
| Filing of Notice, Stipulation, and exhibits thereto via Form 8-K with the SEC | Within 10 days after the Court enters the Preliminary Approval Order |
| Posting of Notice, Stipulation, and exhibits thereto on Paysign's website | Within 10 days after the Court enters the Preliminary Approval Order |

| Last day for counsel for Paysign to file appropriate affidavit with respect to preparation and dissemination of Notice and Summary Notice | At least 10 days prior to Settlement Hearing |
|---|---|
| Filing of all papers in support of the Settlement, including the Fee and Expense Award and Service Awards | 28 days before the Settlement Hearing |
| Last day for Current Paysign Stockholders to comment on the Settlement | 14 days before the Settlement Hearing |
| Filing of all reply papers in support of the Settlement, including responses to objections, if any | 7 days before the Settlement Hearing |
| Final Settlement Hearing | Approximately 45 days after the Notice Date[8] |

## IX.   **CONCLUSION**

Plaintiffs respectfully submit that the Court should preliminarily approve the Settlement, schedule the Settlement Hearing, and authorize the dissemination of Notice to Current Paysign Stockholders. The Nevada Plaintiffs have conferred with counsel for Defendants regarding this Motion, and they have informed the Nevada Plaintiffs that Defendants do not oppose the Motion.

---

[8]    Plaintiffs are prepared to coordinate a mutually agreeable date with the Court's Deputy Clerk for inclusion in the Preliminary Approval Order prior to entry.

Dated:  December 5, 2024

**COULTER HARSH LAW**

By /s/
        Karl H. Smith, Esq.

Karl H. Smith, Esq.
Nevada Bar No. 6504
403 Hill Street
Reno, NV 89501
Telephone: (775) 324-3380
Facsimile: (775) 324-3381

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for the Nevada Plaintiffs*

Dated:        December 5, 2024

**ALDRICH LAW FIRM, LTD.**

By */s/ John P. Aldrich, Esq.*
        John P. Aldrich, Esq.

John P. Aldrich, Esq.
Nevada Bar No. 6877
7866 West Sahara Avenue
Las Vegas, NV 89117
Telephone: (702) 853-5490
Fax: (702) 227-1975
Email: jaldrich@johnaldrichlawfirm.com

**SHUMAN, GLENN & STECKER**
Kip B. Shuman
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (303) 861-3003

Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003

Brett D. Stecker
326 West Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003

*Counsel for the Nevada Plaintiffs*

**KASKELA LAW LLC**
Seamus Kaskela
Adrienne Bell
18 Campus Boulevard Suite 100
Newtown Square, PA 19073
Telephone: (888) 715-1740

*Additional Counsel for Plaintiff John K. Gray*